# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HAL O. COLLIER, individually and behalf      :
of all others similarly situated,      :
     :      NO. 3:04CV1232 (MRK)
            Plaintiff,      :
     :
v.      :
     :
AKSYS LTD., et al.,      :
     :
            Defendants.      :

## MEMORANDUM OF DECISION

In this securities fraud action, Plaintiff Hal O. Collier, on behalf of himself and an as-yet uncertified class of short sellers, claims that Defendants Durus Capital Management, LLC ("Durus Capital"), Durus Life Sciences Master Fund Ltd. ("Durus Master Fund"), and Scott Sacane made material misrepresentations and omissions that artificially deflated the price of Aksys, Ltd. ("Aksys") stock, in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. § 240.10b-5(b), and Sections 20(a) and 20A of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78t(a) & 78t-1.  Presently before the Court are Defendants' Motions to Dismiss [docs. #37 & #39] all of Mr. Collier's claims.  Defendants argue, among other things, that even though Mr. Collier has had three opportunities to do so, he has still failed adequately to plead "loss causation" – that is, the required "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003), *quoted in Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).  For the reasons that follow,

1

the Court agrees with Defendants and grants their motions to dismiss.

## I.

On a motion to dismiss pursuant to Rule 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true." *Todd v. Exxon Corp.*, 275 F.3d 191, 197 (2d Cir. 2001). "A complaint should not be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* at 197-98 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Thus, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996).

Furthermore, on a Rule 12(b) motion, "[a] complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations and quotations omitted). A document is integral to the complaint "where the complaint relies heavily upon its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quotations omitted). As the Second Circuit stated in *Chambers*, "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id.* (emphasis in original). Finally, and as is relevant to the present case, a court considering a motion to dismiss may look at "public disclosure documents required by law to be, and that have been, filed with the [Securities and Exchange Commission ("SEC")]," and at public stock prices. *Rothman v. Gregor*, 220 F.3d 81,

2

88-89 (2d Cir. 2000) (citations omitted); *see Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (a court "may also look to public records . . . in deciding a motion to dismiss").  In this regard, the Court notes that the parties agreed at oral argument on April 26, 2005 that the Court could take notice of stock quotations and SEC disclosure documents, without transforming Defendants' motions to dismiss into motions for summary judgment.

## II.

### A.

Mr. Collier filed his original Complaint [doc. #1] in this case on July 22, 2004.  Shortly thereafter, by agreement of the Parties and with approval of the Court, all claims against Defendant Aksys were dismissed without prejudice.  *See* Order [doc. #9] (approving Stipulated Dismissal of Def. Aksys [doc. #8]).  After filing his Complaint, Mr. Collier moved to appoint himself as lead plaintiff and to appoint the law firms of Squitieri & Fearon, LLP and The Wexler Firm as lead counsel [doc. #10], which the Court approved.  See Order [doc. #15].  The parties subsequently agreed that Mr. Collier would file an Amended Complaint, and he did so on December 27, 2004.  *See* Am. Compl. [doc. #20].  Defendants filed their motions to dismiss [docs. #37 & #39] on February 16, 2005.  During the course of briefing on Defendants' motions to dismiss, Mr. Collier filed a Second Amended Class Action Complaint [doc. #52] in an effort to respond to Defendants' arguments, and the parties agreed at oral argument that the Court should consider the Second Amended Class Action Complaint [doc. #52] as the operative complaint for purposes of Defendants' motions to dismiss.  Furthermore, Mr. Collier confirmed at oral argument that his Second Amended Class Action Complaint [doc. #52] was his last and

3

best effort to plead a viable cause of action in this case.

## B.

The following facts are taken from the Second Amended Class Action Complaint [doc. #52] and its attachments, from public disclosure documents filed with the SEC, and from public stock prices.

Aksys is a Delaware corporation with a principal place of business in Lincolnshire, Illinois, which primarily provides dialysis products and services for patients suffering from chronic kidney failure.  *See* Aksys Ltd. SEC Form 10-K, filed March 16, 2005 (Annual Report of Aksys Ltd. for the fiscal year ending December 31, 2004), *available at* http://www.sec.gov/Archives/edgar/data/902600/000110465905011472/a05-4987_110k.htm. Aksys common stock is registered pursuant to Section 12(g) of the Securities Exchange Act of 1934, 15 U.S.C. § 78l(g), and trades on the Nasdaq National Market under the ticker symbol "AKSY".  *See* Second Am. Compl. [doc. #52] at ¶ 6.  During the relevant period, Aksys had upwards of 29.7 million shares of common stock issued and outstanding.  *See id.*

Mr. Collier seeks to represent a class of "all persons and entities that sold shares of common stock of Aksys at any time from December 20, 2001 through July 24, 2003 and suffered damages thereby."  *Id.* at ¶ 10.  Despite the breadth of Mr. Collier's claim, his counsel confirmed at oral argument that the putative class includes only short-sellers and does not include *all* sellers of Aksys common stock during the relevant time period.  Short-selling is a well-established, but extremely risky securities trading practice.  As succinctly explained by the Second Circuit, "a short sale involves a customer who . . . speculates that a particular stock will go down in price and seeks to profit from that drop."  *Levitin v. PaineWebber, Inc.*, 159 F.3d 698, 700 (2d Cir.

1998).  A short sale transaction

> begins with the customer selling stock that she does not own. The customer "borrows" the stock to be sold, typically from her broker. The broker obtains the stock that it loans to the customer either from its own reserves or by borrowing it from external sources, such as other brokers or other customers. Later – sometimes considerably later – the customer "covers" the short by buying identical stock and restoring it to the broker-lender. If the price of the stock declines, as the customer hopes, the customer can purchase the stock at a lower price than the one at which she sold the borrowed stock, profiting from the difference between the sale and purchase prices.

*Id*.  In sum, a short seller bets that a stock will drop in price; whether he gains or loses on his bet depends upon whether the stock price has dropped or risen before the point in time at which he must cover.

Mr. Collier engaged in a series of short sales of Aksys stock over the period December 20, 2001 to July 24, 2003.  Mr. Collier initially short-sold 15,000 shares of Aksys stock from February 18, 2003 through February 21, 2003, at prices ranging from $5.85 to $5.90 per share. *See* Plaintiff's Sworn Certification, Ex. 2 attached to Affidavit of Lee Squitieri [doc. #47].  Mr. Collier covered this first short-sale with a cover purchase of 15,000 shares on February 26, 2003 at prices ranging from $6.00 to $6.14 per share.  *See id.*

Mr. Collier then short-sold 13,000 shares of Aksys stock as follows: 5,000 shares on February 26, 2003 at $5.97 per share; 4,000 shares on March 26, 2003 at $6.98 per share; 2,000 shares on May 12, 2003 at $7.86 per share; and 2,000 shares on June 12, 2003 at $10.50 per share.  *See id.*  Mr. Collier covered this second set of short-sales of 13,000 shares as follows: a cover purchase of 4,000 shares on April 8, 2003 at $7.25 per share; a cover purchase of 2,000 shares on July 24, 2003 at $15.67 per share; a cover purchase of 5,000 shares on February 25, 2004 at $7.80 per share; and a cover purchase of 2,000 shares on February 25, 2004 at $7.80 per

share.  *See id.*[1]

Defendant Durus Capital is a Delaware limited liability company with its principal place of business in South Norwalk, Connecticut.  *See* Second Am. Compl. [doc. #52] at ¶ 7. Defendant Durus Capital is the portfolio manager of the Durus Master Fund, a hedge fund.[2]  *See id.* at ¶¶ 7-8.  Defendant Scott Sacane is the managing member of Durus Capital, and he possessed voting and dispositive power over the Aksys stock owned by the Durus Master Fund. *See id.* at ¶ 9.  Mr. Sacane also directed the purchases of Aksys stock that are the subject of this lawsuit, and signed documents with the SEC that Mr. Collier alleges contained false and misleading statements and omissions.  *See id.*  Contrary to Mr. Collier's statement in his Second Amended Class Action Complaint [doc. #52] at ¶ 63, the parties recently stipulated that Mr. Collier no longer claims that Mr. Sacane is the managing member of the Durus Master Fund.  *See* Supplemental Brief [doc. #68].

---

[1] It is unclear from the record before the Court which of the two 2,000 share short sales (on May 12, 2003 and June 12, 2003) correspond with the two 2,000 share cover purchases (on July 24, 2003 and February 25, 2004).

[2] According to a recent report of the SEC,

[a]lthough financial service providers, regulators and the media commonly refer to "hedge funds," the term has no precise legal or universally accepted definition. The term generally identifies an entity that holds a pool of securities and perhaps other assets that does not register its securities offerings under the Securities Act [of 1933, 15 U.S.C. § 77 *et seq.*] and which is not registered as an investment company under the Investment Company Act [of 1940, 15 U.S.C. § 80a *et seq.*]. Hedge funds are also characterized by their fee structure, which compensates the adviser based upon a percentage of the hedge fund's capital gains and capital appreciation.

U.S. Securities and Exchange Commission, *Implications of the Growth of Hedge Funds*, Executive Summary at viii (2003), *available at* http://www.sec.gov/news/studies/hedgefunds0903.pdf (last visited Aug. 8, 2005).

Defendants accumulated significant quantities of Aksys stock throughout the class period, with dramatic accumulations from November 2002 until the end of July 2003.  Specifically, Defendants owned approximately 8% of the outstanding common shares of Aksys by February 1, 2002, 22% by November 8, 2002, 44% by March 31, 2003, 62% by June 10, 2003, and 77% by July 25, 2003.  *See* Second Am. Compl. [doc. #52] at ¶¶ 8, 17, 25, 26, 27, 33, 37, 46.  Aksys publicly disclosed Defendants' ownership interest in Aksys for the first time in a press release on July 25, 2003.  *See* Aksys' Form 8-K (dated July 25, 2003), attached to Affidavit of Harry S. Davis [doc. #41] at Ex. C (disclosing press release issued by Aksys which announced that Aksys was advised by Mr. Sacane that the investors he represents have accumulated in excess of 77% of Aksys' outstanding stock).  Pursuant to Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d), and Rule 13d-1, 17 C.F.R. § 240.13d-1, Defendants filed Schedule 13Ds with the SEC on July 28, 2003, October 30, 2003, February 26, 2004, and November 18, 2004.  *See* Affidavit of Jeffrey P. Wade [doc. #42] at Ex. 4, 5, 6 & 7.  Pursuant to Section 16(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(a), and Rule 16a-3, 17 C.F.R. § 240.16a-3, Defendants also filed Form 3s and numerous Form 4's on July 30, 2003 and October 30, 2003.  *See id.* at Ex. 8, 9, 10 & 11.  These filings revealed the extent of Defendants' ownership interest in Aksys, and the details of their trades in Aksys stock during the class period.

To better understand the movement of Aksys common stock during the class period, Defendants prepared a graph that Mr. Collier does not dispute sets forth daily closing prices of Aksys stock from December 20, 2001 to December 31, 2004.  *See generally* Summary Graph of Historical Daily Price Data for Aksys Stock, attached to Affidavit of Harry S. Davis [doc. #41] at Ex. B.  The graph has been reproduced in an appendix to this decision as an aid to the reader.  On

December 20, 2001, the beginning of the class period, Aksys stock closed at $4.20 per share.  *See Historical Daily Price and Volume Trading Data for Aksys stock from Thompson Financial / West Group*, Exhibit A attached to Affidavit of Harry S. Davis [doc. #41].  From December 20, 2001 to October 30, 2002, the stock price fluctuated between roughly $4.00 per share to over $8.00 per share, with a high of $8.78 per share (March 28-29, 2002) and a low of $3.90 per share (October 30, 2002).  *See id.*  The stock steadily climbed from $3.90 per share on October 30, 2002 to a peak of $15.85 per share on July 24, 2003, eventually closing at $15.01 per share on July 24, 2003, the day before Defendants first publicly announced the extent of their ownership of Aksys stock.  *See id.*  From July 25, 2003, the date of Defendants' press release, to August 8, 2003 the price of Aksys stock plummeted to a low of $6.90 per share, eventually closing at $7.60 per share on August 8, 2003.  *See id.*  The stock rebounded in September 2003, closing at a high of $12.87 per share on September 23, 2003.  *See id.*  Since September 23, 2003, however, the stock price has trended downward (with normal fluctuations), closing out the year 2004 at $5.56 per share on December 31, 2004.  *See id.*

## III.

A complaint alleging securities fraud must meet the heightened pleading requirements of Rule 9(b) of the *Federal Rules of Civil Procedure* and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995), codified at 15 U.S.C. § 78u-4.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000).

Rule 9(b) of the *Federal Rules of Civil Procedure* requires all claims of fraud and the circumstances of fraud to be pleaded with particularity.  The purpose of Rule 9(b)'s specificity requirement is to provide a defendant with fair notice of a plaintiff's claim and adequate

information to frame a response.  *See generally* 5A Charles Alan Wright et al., *Federal Practice & Procedure Civil 3d* § 1298, at 192 (3d ed. 2004).  The Second Circuit "has read Rule 9(b) to require that a complaint '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

Similarly, the PSLRA requires that

> any securities fraud complaint alleging misleading statements or omission[s] of material fact[s] must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

*Rombach*, 355 F.3d at 170 (quoting 15 U.S.C. § 78u-4(b)(1)).  As the Second Circuit recently emphasized in *Lentell v. Merrill Lynch & Co.*, *supra*, "[a]ny fraud must be pled with particularity, but the rule is applied assiduously to securities fraud."  *Lentell*, 396 F.3d at 168 (citation omitted).  "This Circuit's strict pleading requirements in securities-fraud cases were (essentially) codified in the Private Securities Litigation Reform Act of 1995.  So no claim should be filed unless and until it can be supported by specific factual allegations."  *Id.* (citations omitted).

In *Lentell*, the Second Circuit explained that in order to state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b), securities fraud plaintiffs must plead with particularity that a defendant: "'(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate

cause of their injury.'" *Lentell*, 396 F.3d at 172 (quoting *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998)).  The last two requirements are typically referred to as "transaction causation" and "loss causation."  *See Lentell*, 396 F.3d at 172-73.  Transaction causation is "akin to reliance," and "[i]n the securities fraud context, transaction causation is presumed when a claim rests on a material omission." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001).  By contrast, the Second Circuit has "described loss causation in terms of the tort-law concept of proximate cause, *i.e.*, that the damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission, but the tort analogy is imperfect." *Id.* (internal citations and quotations omitted).

Below, the Court addresses each of the five required elements identified in *Lentell*. Although Mr. Collier met most of these pleading requirements, he failed to plead loss causation adequately.  Therefore, the Court concludes that Mr. Collier failed to state a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5(b).

## A.  Misstatements or Omissions of Material Fact

As noted above, Mr. Collier must first allege with particularity that Defendants made misstatements or omissions of material fact in connection with the purchase or sale of securities. *Lentell*, 396 F.3d at 172.  "For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Castellano*, 257 F.3d at 180 (internal quotations omitted).  In his Second Amended Class Action Complaint [doc. #52], Mr. Collier claims that Defendants made material omissions and fraudulent misstatements when they failed to report properly their increasing accumulation of

Aksys stock from February 1, 2002 until July 25, 2003, described in Part II, *supra*, and that

Defendants misrepresented their control intentions with respect to Aksys, all in violation of

Sections 13(d), 13(g), and 16(a) of the Securities Exchange Act of 1934, and the corresponding

SEC rules.  *See* 15 U.S.C. §§ 78m(d) & (g); 15 U.S.C. § 78p(a); 17 C.F.R. § 240.13d-1; 17

C.F.R. § 240.13d-2; 17 C.F.R. § 240.16a-3.

Mr. Collier's allegations primarily center around the filing – or failure to file – Schedule

13D and Schedule 13G forms with the SEC.  Section 13(d) of the Exchange Act of 1934

"requires a purchaser of any equity security registered pursuant to § 12 of the Securities

Exchange Act, 15 U.S.C. § 78l, to file a Schedule 13D with the [SEC] within 10 days after its

purchases have exceeded 5% of the outstanding shares of the security."  *Edgar v. MITE Corp.*,

457 U.S. 624, 628 n.2 (1982).  A Schedule 13G – a short form of a Schedule 13D – "is similar to

a Schedule 13D, but it may be filed only by certain classes of purchasers and only if the

purchasers have no intent to change or influence the issuer or to act in concert with others who so

intend."  *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 616 (2d Cir.

2002) (citing 17 C.F.R. § 240.13d-1(c)).  *See also* Peter G. Samuels, *Schedules 13D and 13G:*

*Reporting Beneficial Ownership of Registered Voting Securities*, 1392 PLI/Corp 493, 496 (Oct.

2003).

Mr. Collier alleges that Defendants filed a Schedule 13G on February 1, 2002 that

revealed that they owned 8.23% of the outstanding Aksys stock.  *See* Second Am. Compl. [doc.

#52] at ¶ 25.  Mr. Collier further alleges that during the time period from February 1, 2002 until

November 8, 2002, Defendants failed to file, as required under 17 C.F.R. § 240.13d-2, necessary

"prompt" amendments to their Schedule 13G as their accumulations of Aksys stock increased

from 5% of the company to over 20%.  *See* Second Am. Compl. [doc. #52] at ¶ 26.[3]  Mr. Collier

asserts that once Defendants passed the 20% ownership barrier of Aksys in or about November

2002, Defendants improperly filed a Schedule 13G, rather than a Schedule 13D, as required

under 17 C.F.R. § 240.13d-1(c).  *See* Second Am. Compl. [doc. #52] at ¶ 27.  *See also* SEC

Release No. 34-39538, *published in* 63 F.R. 2854 (January 16, 1998).  Mr. Collier also claims

that Defendants failed promptly to file necessary amendments to their Schedule 13G (or what

should have been a Schedule 13D) as they accumulated approximately 77% of the issued Aksys

stock from November 12, 2002 until July 28, 2002, once again all in violation of 17 C.F.R. §

240.13d-2.  *See* Second Am. Compl. [doc. #52] at ¶ 29.

In addition to alleging violations of the reporting requirements under Section 13 of the

Securities Exchange Act of 1934, Mr. Collier also alleges that as a consequence of Defendants'

---

[3] Mr. Collier alleges that Defendants should be considered a "group" under Section 13 and thus they all were subject to the reporting requirements of Section 13 jointly.  *See* Second Am. Compl. [doc. #52] at ¶¶ 16, 18, 19.  The Court is willing to assume *arguendo* for purposes of this motion to dismiss that Defendants qualify as a group for purposes of the reporting requirements of Section 13.  *See* 15 U.S.C. § 78m(d)(3) ("When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection."); 15 U.S.C. § 78m(g)(3) (same); 17 C.F.R. § 240.13d-5(b)(1) ("When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.").  *See also Egghead.Com, Inc. v. Brookhaven Capital Mgmt. Co.*, 340 F.3d 79, 83-84 (2d Cir. 2003) ("Section 13(d) of the Exchange Act requires any entity (*or group of entities*) which is the beneficial owner of more than five percent of particular types of individual equity securities to disclose that fact to the [SEC]. Under § 13, the definition of beneficial owner is quite broad. . . . This broad definition of beneficial ownership is consistent with § 13's purpose, which is to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control.") (emphasis added) (internal quotations and citations omitted).

dramatic accumulations of Aksys stock, they became "insiders" and thus violated the reporting requirements of Section 16(a) of the Securities Exchange Act of 1934.  *See* 15 U.S.C. § 78p(a). "An 'insider' is defined in the statute as a beneficial owner of more than ten percent of any class of the company's non-exempt, registered equity securities, or a director or officer of the company issuing the stock."  *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing 15 U.S.C. § 78p(a) & (b)).  "Section 16(a) require[s] covered parties to disclose (i) their initial ownership interests, and (ii) subsequent changes thereto, within ten days of a transaction. According to Rule 16a-3, the initial statements of ownership interest are reported on Form 3s; changes in ownership interest are reported on Form 4s."  *Litzler v. CC Invs., L.D.C.*, 362 F.3d 203, 206 (2d Cir. 2004) (footnote omitted) (citing 15 U.S.C. §§ 78p(a)(2)(B)-(C); 17 C.F.R. § 240.16a-3(a)).[4]

In addition to these alleged material omissions regarding Defendants' alleged failure to file required reports with the SEC, Mr. Collier also claims that in the few reports Defendants did submit to the SEC during the class period, they misrepresented their true intentions regarding control of Aksys.  Specifically, Mr. Collier notes that in Defendants' Schedule 13G (filed on February 1, 2002 and Schedule 13G (filed on November 12, 2002), Defendants stated the

---

[4] Mr. Collier implicitly alleges that Defendants qualify as a "group" under Section 16 as well as Section 13.  *See* Second Am. Compl. [doc. #52] at ¶ 16, 22; note 3, *supra*.  The Second Circuit has recently cautioned that "the rules for determining beneficial ownership under § 16 are less inclusive than those governing determination of beneficial ownership for purposes of § 13." *Egghead.Com*, 340 F.3d at 84.  Nonetheless, Mr. Collier asserts that once Defendants passed the 10% ownership barrier in or about February 2002, they failed to file a Form 3 and numerous subsequent Form 4s throughout the time period from February 2002 to July 2003, all as required under the relevant securities laws, and that these failures constituted material omissions regarding Defendants' growing ownership of Aksys stock.  *See* Second Am. Compl. [doc. #52] at ¶¶ 22-23. Once again, for purposes of the motions to dismiss, the Court is willing to assume *arguendo* that Defendants were a "group" under Section 16.

following:

> The securities referred to above were acquired in the ordinary course of business and were not acquired for the purpose of and do not have the effect of changing or influencing the control of the issuer of such securities and were not acquired in connection with or as a participant in any transaction having such purpose or effect.

*See* Second Am. Compl. [doc. #52] at ¶¶ 25, 27; *see also* Affidavit of Jeffrey P. Wade [doc. #42], at Ex. 2 (copy of Defendants' February 1, 2002 Schedule 13G) & Ex. 3 (copy of Defendants' November 12, 2002 Schedule 13G).  According to Mr. Collier, this statement was "materially false and misleading since defendants knew that their plan was to continue buying Aksys stock without disclosing the increase in their ownership of the stock of Aksys and to acquire a controlling interest in Aksys."  *See* Second Am. Compl. [doc. #52] at ¶¶ 25, 28.  Furthermore, Mr. Collier alleges that when Durus Capital filed a Form 13F quarterly report on May 8, 2003 for the quarter that ended on March 31, 2003, the company misrepresented its ownership of Aksys stock, reporting that it only owned 5,283,248 shares of Aksys, when in fact Durus Capital owned over 10 million shares, or approximately 44%, of Aksys common stock.  *See* Second Am. Compl. [doc. #52] at ¶ 31.

Defendant Durus Master Fund has argued that Mr. Collier has not pleaded alleged misstatements or omissions by Defendants as a group – or Durus Master Fund on its own – with sufficient specificity, even after Mr. Collier filed his Second Amended Class Action Complaint [doc. #52].  *See* Defs.' Mem. in Support of Durus Master Fund's Motion to Dismiss [doc. #40] at 7; Def. Durus Master Fund's Reply [doc. #55] at 14.[5]  The Court disagrees.  Mr. Collier has

---

[5] Defendants also claim that they filed numerous 13G's, 13D's, Form 3's and Form 4's, which report all the trades and accumulations of Aksys stock during the relevant time period, and that these filings provided the basis for Mr. Collier's allegations in his complaints, thus implying

sufficiently pleaded misstatements or omissions by Defendants as a group.  However, whether

Defendants are appropriately considered a group under Section 13 or Section 16 is an issue that

the Court concludes it need not decide because of the Court's ruling regarding loss causation in

Part III.D, *infra*.  Therefore, for purposes of Defendants' motions to dismiss, the Court assumes

that Mr. Collier has satisfied the pleading requirements for material misrepresentations or

omissions by Defendants, who the Court will assume acted as a group in connection with their

accumulation of Aksys stock during the class period.

## B.  Scienter

Under Section 101(b) of the PSLRA,

> In any private action arising under this chapter in which the plaintiff may recover
> money damages only on proof that the defendant acted with a particular state of
> mind, the complaint shall, with respect to each act or omission alleged to violate
> this chapter, *state with particularity facts giving rise to a strong inference that the
> defendant acted with the required state of mind*.

15 U.S.C. § 78u-4(b)(2) (emphasis added).  "The requisite state of mind, or scienter, in an action

under section 10(b) and Rule 10b-5, that the plaintiff must allege is an intent to deceive,

manipulate or defraud."  *Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001) (internal

quotations omitted).  "Scienter is a necessary element of every 10b-5 action, and though it need

---

that there were no material omissions.  *See* Defs.' Mem. in Support of Durus Master Fund's
Motion to Dismiss [doc. #40] at 7; *see also* Affidavit of Jeffrey P. Wade [doc. #42] at Exs. 2-11.
As Defendants must acknowledge, however, the full, complete, and accurate picture of
Defendants' accumulation of Aksys stock from November 12, 2002 until July 25, 2003 was only
revealed when Defendants filed their Schedule 13D on July 28, 2003 – that is, *after* Defendants
had already accumulated the majority of Aksys stock.  *See* Affidavit of Jeffrey P. Wade [doc.
#42] at Ex. 4; *see also* Defs.' Mem. in Support of Durus Master Fund's Motion to Dismiss [doc.
#40] at 10 (acknowledging that the Aksys press release on July 25, 2003 was the "first public
disclosure of Defendants' substantial holdings in Aksys common stock").  Thus, the Court has
difficulty, particularly at the motion to dismiss stage, taking seriously Defendants' implicit
suggestion that they hid nothing from the market from December 20, 2001 until July 25, 2003.

not be plead with great specificity, the facts alleged in the complaint must give rise to a strong

inference of fraudulent intent." *In re Time Warner Inc. Secs. Litig.*, 9 F.3d 259, 268-69 (2d Cir.

1993) (internal citations and quotations omitted).  A strong inference of fraudulent intent may be

established either "'(a) by alleging facts to show that defendants had both motive and opportunity

to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of

conscious misbehavior or recklessness.'" *Eternity Global Master Fund Ltd. v. Morgan Guar.*

*Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (quoting *Acito v. IMCERA Group, Inc.*, 47

F.3d 47, 52 (2d Cir. 1995)).

      Defendants argue that Mr. Collier has failed properly to plead scienter.  *See* Defs.' Mem.

in Support of Def. Sacane & Durus Capital Mot. to Dismiss [doc. #38] at 6-12; *see also* Defs.'

Mem. in Support of Durus Master Fund's Mot. to Dismiss [doc. #40] at 21 (joining co-

Defendants' arguments on scienter).  However, Mr. Collier clearly alleges that Defendants were

aware of the relevant reporting requirements during the class period and that they chose not to

not abide by those requirements.  *See* Second Am. Compl. [doc. #52] at ¶¶ 52, 53 & 54(a)-(h).

Such an allegation can be enough to create an inference of fraudulent intent, insofar as it raises an

inference that Defendants knew that their public statements were inaccurate.  *See, e.g.*, *Novak v.*

*Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (inference of fraudulent intent may arise where the

complaint sufficiently alleges that the defendants "knew facts or had access to information

suggesting that their public statements were not accurate"); *Hallwood Realty Partners, L.P. v.*

*Gotham Partners, L.P.*, 95 F. Supp. 2d 169, 174 (S.D.N.Y. 2000) ("The fraud alleged in the

fourth cause of action is the knowing non-disclosure, in a series of 13D and 13G filings, of the

fact that the defendants were part of a group. . . . [No one could] seriously question . . . that

sophisticated investors such as these knew of their obligation to disclose that fact and therefore that there is strong circumstantial evidence of conscious misbehavior which amply satisfies both Rule 9(b) and the PSLRA."); *see also Martin v. Durus Capital Mgmt.*, No. 04 C 555, slip op. at 7-8 (N.D. Ill. Mar. 31, 2005) (Gottschall, J.) (finding that plaintiff adequately pleaded scienter by alleging, *inter alia*, specific details of defendants' repeated disregard of reporting obligations with the SEC, that defendants were clearly aware of) (unpublished opinion, attached to Affidavit of Patrick J. McHugh [doc. #54] at Ex. B).

As an additional basis for establishing Defendants' scienter, Mr. Collier also alleges that Defendants' motivation was to drive up the price of Aksys stock for their own personal financial benefit. *See* Second Am. Compl. [doc. #52] at ¶¶ 53 & 54. Allegations of personal financial benefit can also give rise to an inference of fraudulent intent. *See Novak*, 216 F.3d at 311 (inference of fraudulent intent may arise where the complaint sufficiently alleges that the defendants "benefitted in a concrete and personal way from the purported fraud"). That said, it is also true that certain portions of Mr. Collier's pleadings regarding Defendants' motives – that is, to artificially drive the price of Aksys stock up – may contradict some of Mr. Collier's pleadings on loss causation, since Mr. Collier elsewhere claims that because of Defendants' actions, the "market prices of Aksys' securities were artificially *suppressed* throughout the Class Period." Second Am. Compl. [doc. #52] at ¶ 55 (emphasis added); *see also id.* at ¶ 32 ("Defendants' concealments, omissions and misrepresentations were intentional and operated as a fraud on the market of Aksys stock and suppressed the price of Aksys stock and induced the plaintiff and the Class to sell at artificially low price levels."). *See Atl. Gypsum Co. v. Lloyds Int'l Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) ("Plaintiffs' view of the facts defies economic reason, and

17

therefore does not yield a reasonable inference of fraudulent intent."), *cited in Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).

In the end, the Court concludes that it need not decide whether Mr. Collier has adequately pleaded scienter because of the Court's ruling regarding loss causation in Part III.D, *infra*. Therefore, for purposes of Defendants' motions to dismiss, the Court assumes *arguendo* that Mr. Collier has satisfied the pleading requirements for scienter.

### C. Transaction Causation

The Second Circuit has held that at the pleading stage, the requirement to plead transaction causation "requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Lentell*, 396 F.3d at 172 (quoting *Emergent Capital*, 343 F.3d at 197).

Mr. Collier does not allege in this action that he contemporaneously read the alleged misstatements in Defendants' Schedule 13G's on February 1, 2002 and November 12, 2002, and Defendants' Form 13F filed on May 8, 2003, while he was short selling Aksys stock. In fact, Mr. Collier pleaded total ignorance of all Defendants' actual or omitted filings with the SEC. *See* Second Am. Compl. [doc. #52] at ¶ 56. Instead, Mr. Collier relies on the "fraud-on-the-market presumption" described in *Basic v. Levinson*, 485 U.S. 224, 247 (1988), by specifically pleading that they relied upon the "integrity and efficiency of the market for Aksys' securities." Second Am. Compl. [doc. #52] at ¶ 56. As recently stated by the Second Circuit:

> The fraud-on-the-market doctrine, as described by the Supreme Court in *Basic v. Levinson*, creates a rebuttable presumption that (1) misrepresentations . . . affect the price of securities traded in the open market, and (2) investors rely on the market price of securities as an accurate measure of their intrinsic value. This presumption, if unrebutted, thus allows plaintiffs to satisfy the element of reliance

in securities fraud claims under the 1934 Act.

*Hevesi v. Citigroup Inc.*, 366 F.3d 70, 77 (2d Cir. 2004) (citing *Basic*, 485 U.S. at 245-47; *In re Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953, 967 (2d Cir. 1993)).

Based upon the allegations in the Second Amended Class Action Complaint and the Second Circuit's decision in *Hevesi*, the Court concludes that Mr. Collier has adequately pleaded transaction causation based on the fraud-on-the-market doctrine.

### D.  Loss Causation

Having concluded or assumed that Mr. Collier has adequately plead with particularity four of the five factors delineated in *Lentell*, the Court views the determinative issue on Defendants' motions to dismiss as whether Mr. Collier adequately pleaded loss causation – *i.e.*, the "causal link between the [defendant's] alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell*, 396 F.3d at 173 (internal quotations omitted).

The Second Circuit recently clarified that to adequately plead loss causation in a securities fraud case based on an alleged material misrepresentation or omission, "a plaintiff must allege that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, *when disclosed*, negatively affected the value of the security."  *Lentell*, 396 F.3d at 173 (citation and quotations omitted) (second emphasis added).  Therefore, in order to adequately plead loss causation, a plaintiff must plead with particularity that his investment loss was "foreseeable" and was "caused by the *materialization of the concealed risk*" – that is, the revelation of the alleged misstatement or omission.  *Id.* (emphasis added).

Moreover, as the Supreme Court recently observed in *Dura Pharmaceuticals, Inc. v.*

*Broudo*, 125 S. Ct. 1627 (2005), "an inflated purchase price will not *itself* constitute or

proximately cause the relevant economic loss." *Id.* at 1631 (emphasis added).  The Supreme

Court cogently explained why this is so:

> For one thing, as a matter of pure logic, at the moment the transaction takes place,
> the plaintiff has suffered no loss; the inflated purchase payment is offset by
> ownership of a share that *at that instant* possesses equivalent value. Moreover, the
> logical link between the inflated share purchase price and any later economic loss
> is not invariably strong. Shares are normally purchased with an eye toward a later
> sale. But if, say, the purchaser sells the shares quickly before the relevant truth
> begins to leak out, the misrepresentation will not have led to any loss. If the
> purchaser sells later after the truth makes its way into the market place, an initially
> inflated purchase price *might* mean a later loss. But that is far from inevitably so.
> When the purchaser subsequently resells such shares, even at a lower price, that
> lower price may reflect, not the earlier misrepresentation, but changed economic
> circumstances, changed investor expectations, new industry-specific or
> firm-specific facts, conditions, or other events, which taken separately or together
> account for some or all of that lower price.

*Id.* at 1631-32 (emphasis in original).

　　　In other words "[i]t is not enough to allege that a defendant's misrepresentations and

omissions induced a purchase-time value disparity between the price paid for a security and its

true investment quality." *Lentell*, 396 F.3d at 174.  *See also Emergent Capital*, 343 F.3d at 198

("Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss

causation pleading requirement."); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, No. 02 Civ.

7689(HB), 2005 WL 1663265, at *7 (S.D.N.Y. Jul. 18, 2005) ("[C]ases have repeatedly shown

that overpayment alone does not prove causation and a claimant to collect on such a theory must

prove that the breach or misrepresentation resulted in an actual injury or loss not attributable to

other factors.") (citing *Dura*, 125 S. Ct. at 1632; *Lentell*, 396 F.3d at 174-75).  Instead, Second

Circuit precedent makes it clear that "loss causation has to do with the relationship between the

plaintiff's investment loss and the information misstated or concealed by the defendant." *Lentell*, 396 F.3d at 174.  Furthermore "[i]f that relationship is sufficiently direct, loss causation is established, but if the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie." *Id.* (internal citations and quotations omitted).

Assessing loss causation in a short selling setting is further complicated because the standard model of a securities fraud class action based on misrepresentations or omissions is inverted.  Thus, in order to adequately plead loss causation, Mr. Collier would have to plead with specificity that: (a) Defendants' misstatements and omissions in their SEC filings (described in Part III.A, *supra*) kept the price of Aksys stock artificially *low* (not high) at the time they were short selling the stock; (b) the price of Aksys stock *rose* (not fell) after materialization of the concealed risk; and (c) Mr. Collier suffered financial losses that were causally linked to the revelation of the previously undisclosed information when he had to cover at the *higher* (not lower) prices.

Mr. Collier did, in fact, plead that the price of Aksys stock was artificially low when he was short selling.  *See* Second Am. Compl. [doc. #52] at ¶¶ 44 & 55.  However, the Court notes that the price of Aksys stock rose dramatically throughout most of the class period.  *See* Part II, *supra*.  This dramatic rise in Aksys' stock price can hardly be considered a clear sign that the stock was being kept artificially low.

Nevertheless, the Court recognizes that Mr. Collier could argue – at least in theory – that the price of Aksys stock, though rising during the period of short sales, was rising less than it would have due to Defendants' misrepresentations or omissions.  As explained above, however,

mere allegations that "a defendant's misrepresentations and omissions induced a purchase-time

value disparity between the price paid for a security and its true investment quality," are

insufficient in and of themselves to establish loss causation on their own.  *Lentell*, 396 F.3d at

174; *see also Dura*, 125 S. Ct. at 1631; *Emergent Capital*, 343 F.3d at 198.  And unfortunately

for Mr. Collier, despite three attempts to amend his complaint, he has still not pleaded facts that

sufficiently demonstrate the necessary linkages between this alleged purchase-time value

disparity and the material misrepresentations and omissions.

　　To begin with, when the true magnitude of Defendants' ownership interest (the fraudulent

omission) and their supposedly true intentions for control of Aksys (the fraudulent misstatement)

were revealed to the market on July 25, 2003 – that is, when the "materialization of the concealed

risk" occurred, *Lentell*, 396 F.3d at 173 – the price of Aksys stock precipitously *dropped* roughly

50% in two weeks (from over $15.00 per share on July 24, 2003 to $7.60 per share on August 8,

2003).[6]  This dramatic fall in Aksys' stock price – a negative reaction to the revelation by the

marketplace but a "positive" reaction in the inverted world of a short seller – is precisely the

opposite reaction to the materialization of the concealed risk that Mr. Collier would have needed

---

[6] Mr. Collier originally alleged that this revelation occurred "[o]n or about June 20, 2003."  *See* Am. Compl. [doc. #20] at ¶ 30.  Furthermore, Mr. Collier originally alleged that "[w]hen the truth about defendants' ownership of Aksys was disclosed, the price of Aksys' common stock increased substantially."  *Id.* at ¶ 33.  While this pleading may have been what was *theoretically* required for a short seller to demonstrate loss causation, the events originally pleaded did not actually occur.  Thus, the Court notes the dramatic factual turnaround in Mr. Collier's Second Amended Class Action Complaint [doc. #52], which now states that the "price of Aksys securities *declined* upon disclosure of defendants' position in Aksys stock *on July 25, 2003.* . . . " *Id.* at ¶ 46 (emphasis added).

in order to have adequately pleaded loss causation.[7]  *See Lentell*, 396 F.3d at 173 (loss causation requires "that the misstatement or omission concealed something from the market *that, when disclosed, negatively affected the value of the security*") (emphasis added).  Because the alleged material omissions and misstatements revealed to the market by Defendants on July 25, 2003 caused the price to drop – not rise – Mr. Collier cannot show that the "*subject* of the fraudulent statement or omission was the cause of the actual loss suffered" by Mr. Collier and the class of short sellers he purports to represent.  *Lentell*, 396 F.3d at 173 (emphasis in original).  Indeed, the dramatic drop in Aksys stock should have been the occasion for a short seller to make money, not lose it, since a short seller bets that the stock will fall in price.[8]

_____

[7] Mr. Collier incongruously attempts to explain this precipitous fall in Aksys' stock price by stating that "it is just as likely that the stock dropped because investors were reacting to the portion of the announcement in which defendants[] indicated that they would *not* seek to take control of Aksys."  Pl.'s Mem. in Opp'n to Defs.' Mots. to Dismiss [doc. #48] at 6 n.4 (emphasis in original); *see also id.* at 11 ("[I]t was not the revelation of defendants' position that caused the stock price to decline, but rather it was the announcement that defendants did *not* seek to take control of Aksys which caused the stock price to decline.") (emphasis in original).  If Mr. Collier now argues that Defendants' revelation that they did not intend to take control of Aksys was in fact *true*, such an argument would directly contradict and in fact negate Mr. Collier's allegations that Defendants made material misrepresentations regarding their control intentions for Aksys in their filings with the SEC.  However, "a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."  *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001); *see, e.g.*, *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (sustaining dismissal of the complaint where "attenuated allegations" supporting a claim "are contradicted both by more specific allegations in the complaint and by facts of which [the court] may take judicial notice"); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").

[8] As explained by counsel for Plaintiff at oral argument, a short seller's decision on the best time to cover is usually voluntary (unless the stocks were short-sold on a margin).  Thus, as confirmed at oral argument, Mr. Collier voluntarily chose to cover 2,000 shares of his previous short sales on July 24, 2003 – at or near the peak of Aksys' stock's dramatic rise – based on his

Relying on *Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274 (S.D.N.Y. 2004), Mr. Collier nonetheless suggests that a negative impact on the price of the stock after a corrective disclosure is not the only way to demonstrate loss causation.  *See* Pl.'s Mem. in Opp'n to Defs.' Mots. to Dismiss [doc. #48] at 14.  Instead, Mr. Collier claims that a mere "market correction" can establish loss causation.  *See Fogarazzo,* 341 F. Supp. 2d at 292.  In *Fogarazzo*, the District Court explained that

> inflated stock prices can lead to a loss in one of two ways. First, there can be an external correction to the market, such as a corrective disclosure. . . . Second, there can be a market correction, where ordinary market forces affect the rate of artificial inflation. If, for example, the normal functioning of the securities market causes the inflationary effect to dissipate over time, a customer who buys and sells at inflated prices will still suffer a loss based on the inflated price at the time of purchase so long as the price was less inflated at the time of sale.

*Id.* (quoting *In re Initial Pub. Offering Sec. Litig.*, 297 F. Supp. 2d 668, 673 (S.D.N.Y. 2003)). However, *Fogarazzo*'s "market correction" theory of loss causation applies only in *market manipulation* cases.  *See In re Initial Pub. Offering Sec. Litig.*, No. MDL 1554SAS, 2005 WL 743550, at *6 (S.D.N.Y. Apr. 1, 2005) ("In market manipulation cases, however, the plaintiff's burden is somewhat different, because of the nature of the artificial inflation caused by manipulative conduct. . . . 'In market manipulation cases . . . it may be permissible to infer that the artificial inflation will inevitably dissipate.'") (footnotes omitted) (quoting *In re Initial Pub. Offering Sec. Litig.*, 297 F. Supp. 2d at 674)  Because this case is founded on material misstatements or omissions and not on manipulation (as is explained in greater detail below), mere allegations of purchase-time value disparity between the price paid for a security and its

_____

own guess that the stock would continue to precipitously rise.  Unfortunately for Mr. Collier, this and other bets on the direction of Aksys' stock did not pay off for him.

true investment quality are insufficient, without more, to establish loss causation.  *See Dura*, 125 S. Ct. at 1631; *Lentell*, 396 F.3d at 174.

Another flaw in Mr. Collier's pleading of loss causation relates to the timing of Mr. Collier's representative cover purchases.  Mr. Collier's cover purchases on February 26, 2003, April 8, 2003, and July 24, 2003 all occurred *before* revelation of the alleged material omissions and misstatements.  According to *Lentell*, any losses associated with those pre-revelation cover purchases could not be causally linked to the misstatements and omissions, because the truth relating to Defendants' ownership of Aksys stock had not yet been revealed to the market.  *See Lentell*, 396 F.3d at 175 n.4 ("[Defendant's] concealed opinions regarding 24/7 Media and Interliant stock could not have caused a decrease in the value of those companies before the concealment was made public.").  As one district court judge recently observed, "[a] concealed fact cannot cause a decrease in the value of a stock before the concealment is made public."  *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 DLC, 2005 WL 375314, at *6 (S.D.N.Y. Feb. 17, 2005).  In essence, any losses associated with these pre-disclosure cover purchases are the equivalent to a bare allegation of purchase-time value disparity, which cannot by itself demonstrate loss causation.  *See Dura*, 125 S. Ct. at 1631; *Lentell*, 396 F.3d at 174; *Emergent Capital*, 343 F.3d at 198.

Furthermore, Mr. Collier's representative cover purchases on February 25, 2004 – seven months after the July 25, 2003 revelations regarding Defendants' ownership of Aksys stock – are far too removed in time to be causally linked to the material omissions and misstatements revealed on July 25, 2003.  As noted earlier, the Supreme Court in *Dura* emphasized the pitfalls of looking too far past the initial disclosure of the misstatement or omission to try to establish

25

loss causation.  As the Supreme Court stated:  "Other things being equal, the longer the time

between purchase and sale, the more likely that . . . other factors caused the loss." *Dura*, 125 S.

Ct. at 1632; *see also Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir.

2001) ("The loss causation inquiry typically examines how directly the subject of the fraudulent

statement caused the loss, and whether the resulting loss was a foreseeable outcome of the

fraudulent statement. Related factors include whether intervening causes are present, and *the

lapse of time between the fraudulent statement and the loss*.") (emphasis added) (internal

citations omitted); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir.

1994) ("When *a significant period of time has elapsed* between the defendant's actions and the

plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the

interim.") (emphasis added).

Mr. Collier's representative losses occurred *seven* months after Defendants' revelation, a

virtual lifetime in the market.  Absent some additional allegations, those losses are simply too

remote in time to be causally linked to Defendants' earlier misrepresentations and omissions.

*See, e.g.*, *First Nationwide Bank*, 27 F.3d at 772 (affirming district court's dismissal of complaint

where a "substantial period" of time "between the [plaintiff's] losses and the defendants' alleged

misrepresentations strongly suggests that external factors were a substantial cause of those

losses"); *Citibank, N.A. v. K-H Corp.*, 745 F. Supp. 899, 907 (S.D.N.Y. 1990) (dismissing

securities fraud claim where plaintiff could not establish loss causation where loss occurred

"substantially after" the alleged misrepresentation), *aff'd* 968 F.2d 1489 (2d Cir. 1992).

At oral argument, counsel for Plaintiff rightly pointed out that the price of Aksys stock

rebounded in September 2003.  As a consequence, Mr. Collier argues that it is possible that some

class members covered during September 2003 at prices above their initial short sales and that they would theoretically be able to demonstrate loss causation. *See* Second Am. Compl. [doc. #52] at ¶ 47. However, Mr. Collier, the sole class representative of this putative class action, did not cover during the September 2003 rise in Aksys' stock price. *See* Part II.B, *supra*. And counsel for Plaintiff have not presented the Court with a class representative that did so, even though they have had plenty of time and complete access to relevant SEC filings to find such theoretical people. Moreover, even if there were individuals who sold short during the class period and covered at a loss during the September 2003 price rise, the Court would still find the causal link between the September 2003 rise and the revelation of Defendants' misstatements and omissions over one month earlier inadequate, without more, to demonstrate loss causation. *See Dura*, 125 S. Ct. at 1632. Indeed, to accept Mr. Collier's theory that the one-month delayed rise in Aksys' stock price in September 2003 was directly caused by the revelation of Defendants' accumulation of Aksys stock on July 25, 2003 – and thus completely ignore the dramatic July-August 2003 *fall* in Aksys' stock price immediately following the revelation – would be nonsensical. *Cf. In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 405 ("[A] court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent . . ."); *Atl. Gypsum Co.*, 753 F. Supp. at 514 ("Plaintiffs' view of the facts defies economic reason").

Ultimately, even Mr. Collier begrudgingly acknowledges that the behavior of Aksys' stock price due to Defendants' July 25, 2003 revelation would not likely demonstrate loss causation in what they term a "pure" misrepresentation or omission case under Rule 10b-5(b). *See* Pl.'s Mem. in Opp'n to Defs.' Mots. to Dismiss [doc. #48] at 12-13 ("Defendants argue that

27

loss causation . . . here will be impossible to prove because of the increasing price of Aksys stock throughout the Class Period and the decline in Aksys stock price after July 25, 2003. . . . [T]hat argument may have some merit . . . in a *pure* misrepresentation or omissions case . . . ") (emphasis in original) (footnotes and quotations omitted).  As a consequence, and in the face of the relatively simple facts of this case and the clear reaction of Aksys' stock price to Defendants' revelations, Mr. Collier is forced to plead a convoluted and often contradictory tale of how his claim is a hybrid between a "misrepresentation or omission" case and a "market manipulation" case.  *See* Pl.'s Mem. in Opp'n to Defs.' Mots. to Dismiss [doc. #48] at 8, 11-16; *see also* Second Am. Compl. [doc. #52] at ¶¶ 58-59.  In so doing, Mr. Collier attempts to find cover under the somewhat relaxed specificity requirements that pertain to market manipulation claims.  *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 2005 WL 743550, at *4 ("When a plaintiff's 10b-5 claims are based on market manipulation, the specificity requirement is relaxed to compensate for the inherent difficulty in a plaintiff acquiring specific details on a hidden scheme at the pleading stage."); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 585 (S.D.N.Y. 1997) ("where . . . the principal allegations of wrongdoing involve market manipulation rather than false statements, the level of specificity required by 9(b) is somewhat relaxed").

Mr. Collier portrays his "hybrid" claim as follows: "The market price of Aksys' securities increased significantly as the supply of Aksys stock became constrained because of defendants' *manipulative* activity but was still below the level it would have achieved *had investors been aware of defendants' accumulation* of Aksys stock and their concentrated ownership thereof." Second Am. Compl. [doc. #52] at ¶ 58 (emphasis added).  Mr. Collier thus seeks to fuse the alleged depression of Aksys' stock price from the material misrepresentations and omissions to

the claimed inflation of the stock price arising from Defendants' alleged manipulatively rapid

accumulation of Aksys stock from mid-June 2003 until July 24, 2003.  Mr. Collier further argues

that when his lawsuit is viewed as a "hybrid" misrepresentation-omission/market manipulation

claim, the revelation of Defendants' "hidden" information actually occurred via Defendants'

alleged manipulation of Aksys stock during the dramatic run-up in Aksys' stock price from mid-

June 2003 until July 24, 2003 – that is, *before* the July 25, 2003 press release disclosing

Defendants' ownership of Aksys stock.  As the Second Amended Class Action Complaint [doc.

#52] puts it: "As market awareness of the decrease in the 'public float' increased in approximately

mid-June 2003, the price of Aksys stock began to climb as did the trading volume."  *Id.* at ¶ 40;

*see also* Pl.'s Mem. in Opp'n to Defs.' Mots. to Dismiss [doc. #48] at 6 ("On or about June 20,

2003, the revelation of Defendants' buying program caused an increase in the price of Aksys

stock and the trading volume.").  Counsel for Plaintiff readily conceded at oral argument that

they have no details to support their theory of alleged "market awareness" of Defendants' conduct

pre-July 25, 2003 and that they are merely hypothesizing that this must have occurred from

circumstantial evidence.  Nonetheless, based on the foregoing characterization of his claim, Mr.

Collier argues that he has adequately pleaded loss causation with respect to his representative

cover purchase on July 24, 2003 – the day before Defendants' press release.

        In reality, all Mr. Collier has done through his so-called "hybrid" claim is turn a relatively

simple set of facts into a hopelessly complicated, convoluted, and contradictory mess.  However,

the Court can easily clean up the mess Mr. Collier has made.  Simply put, Mr. Collier has not, in

fact, pleaded a market manipulation claim under Rule 10b-5(a) and 10b-5(c), 17 C.F.R. §

240.10b-5(a) & (c), either in addition to, or as a hybrid component of, their material

misrepresentation or omission claim under Rule 10b-5(b).[9]  As the Supreme Court has noted,

"[m]arket manipulation" is "virtually a term of art when used in connection with securities

markets. The term refers generally to practices, such as wash sales, matched orders, or rigged

prices, that are intended to mislead investors by artificially affecting market activity."  *Santa Fe*

*Indus., Inc. v. Green*, 430 U.S. 462, 476, (1977) (internal quotations and citation omitted).  Mr.

Collier has asserted no such claims.

Moreover, at oral argument, counsel for Plaintiff conceded that Mr. Collier's hybrid

market manipulation claim is entirely based on the misstatements and omissions of Defendants.

However, as the Second Circuit recently explained in *Lentell*, "where the sole basis for [a market

manipulation claim] is alleged misrepresentations or omissions, plaintiffs have not made out a

market manipulation claim under Rule 10b-5(a) and (c)"; rather they have simply stated a

misrepresentation or omission claim under Rule 10b-5(b).  *Lentell*, 396 F.3d at 177 (citing

*Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438, 447-48 (S.D.N.Y. 1999) (refusing to characterize

allegations as market manipulation claims where allegations concerned an aggregation of

material misrepresentations to inflate stock)); *see also In re Initial Pub. Offering Sec. Litig.*, 2005

WL 743550, at *7 ("If plaintiffs' alleged losses were caused by market manipulation, rather than

by misstatements and omissions, then plaintiffs face a lighter burden in pleading their claims.

However, plaintiffs' strenuous efforts to portray their claims as market manipulation claims are to

no avail. The [complaint] clearly alleges numerous misstatements and omissions, but nowhere

refers to the sort of conduct that rises to the standard of 'market manipulation' under the securities

---

[9] Therefore, the Court need not decide whether any such so-called "hybrid" claim is, in fact, cognizable.

laws.") (footnote omitted).  Thus, Mr. Collier has not stated a market manipulation claim, either standing alone or as a part of any purported "hybrid" misrepresentation-omission/manipulation claim.

Based on the simplest and most logical view of the facts alleged, Mr. Collier has not (and apparently cannot) plead loss causation.  The Court hastens to note that by ruling that Mr. Collier failed to plead loss causation, the Court by no means intends to condone Defendants' apparent blatant disregard for the reporting requirements under the Securities Act of 1934, or any other alleged fraudulent activities Defendants may have engaged in with respect to their accumulation of Aksys stock.[10]  Rather, this is simply a case where the strict pleading requirements for securities fraud class actions adopted by the Congress and implemented by the Supreme Court and the Second Circuit prevent Mr. Collier and the class he purports to represent from stating a claim upon which relief may be granted.  *See Dura,* 125 S. Ct. at 1633-34; *Lentell,* 396 F.3d 174. As the Second Circuit explained in *Castellano v. Young & Rubicam, Inc.*, *supra*, "[t]he loss causation requirement is intended to fix a legal limit on a person's responsibility, even for wrongful acts."  *Castellano,* 257 F.3d at 186 (internal citation and quotations omitted); *see Shields,* 25 F.3d at 1130 ("While some fraud may go unpunished as a result of Rule 9(b)'s heightened pleading standard, . . . we cannot eliminate all opportunities for unremedied fraud without creating opportunities for undeserved settlements.").  And as the Supreme Court explained in *Dura,* the securities laws make private securities fraud actions available "not to

---

[10] The Court notes that Aksys itself had previously sued the remaining Defendants (and others) for engaging in fraudulent conduct with respect to their purchases of Aksys stock.  *See Aksys Ltd. v. Sacane, et al.*, No. 3:03-cv-01349 (RNC).  As stated in the Second Amended Class Action Complaint [doc. #52] at ¶ 39, and as confirmed at oral argument, Defendants settled all claims with Aksys for approximately $48.7 million.

provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura*, 125 S. Ct. at 1633.

## IV.

The Court now turns to Mr. Collier's claims under Section 20(a) and Section 20A of the Securities Exchange Act of 1934.  *See* 15 U.S.C. §§ 78t(a) & 78t-1(a).  Section 20(a) provides that

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Section 20A of the Securities Exchange Act of 1934 provides a cause of action against "[a]ny person who violates any provision of [the Securities Exchange Act of 1934] or the rules or regulations thereunder by . . . selling a security while in possession of material, nonpublic information. . . ." 15 U.S.C. § 78t-1(a).

In order to state a claim under Section 20(a), a plaintiff must plead, *inter alia*, "*a primary violation* by a controlled person." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (emphasis added).  Similarly, in order to state a claim under Section 20A, "a plaintiff must plead *a predicate violation of the '34 Act or its rules and regulations.*" *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 703 (2d Cir. 1994) (emphasis added).  Because the Court has already dismissed Mr. Collier's primary Section 10(b) and Rule 10b-5 claims, *see* Part III, *supra*, the Court must also dismiss Mr. Collier's secondary Section 20(a) and Section 20A claims as well.  *See, e.g.*, *Jackson Nat. Life Ins.*, 32 F.3d at 703-04 ("Given the narrow focus of § 20A, we must reject [plaintiff's] invitation to disregard the statute's plain language and apply the statute in

32

the absence of an independent violation of the '34 Act."); *Shields*, 25 F.3d at 1132 ("[B]ecause

we find that the primary violation [of § 10(b) and Rule 10b-5] asserted by [plaintiff] is not

adequately pleaded and therefore properly dismissed by the district court, we also find no error in

the district court's dismissal of the claims of secondary liability under § 20 of the 1934 Act."); *see*

*also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999) ("[C]laims under section

20(A) are derivative, requiring proof of a separate underlying violation of the Exchange Act. . . .

Because plaintiffs have failed to plead a predicate violation of Section 10(b) or Rule 10b-5, the

section 20(A) claim must also be dismissed."); *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476,

501 (S.D.N.Y. 2005) ("Plaintiffs' failure to state a claim for underlying liability eviscerates their

controlling-person liability claim pursuant to Section 20.").

## V.

To summarize, the Court concludes that Mr. Collier's Section 10(b) and Rule 10b-5

claims fail because he has not adequately pleaded loss causation, and Mr. Collier's Section 20(a)

and Section 20A claims fail because he cannot plead a predicate offense.  Accordingly, the Court

GRANTS Defendants' Motions to Dismiss [docs. #37 & #39].

 "[I]t is often appropriate for a district court, when granting a motion to dismiss . . . to

give the plaintiff leave to file an amended complaint."  *Van Buskirk v. The New York Times Co.*,

325 F.3d 87, 91 (2d Cir. 2003); *see Olsen v. Pratt & Whitney Aircraft,* 136 F.3d 273, 276 (2d Cir.

1998) ("Plaintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an

opportunity to amend their complaint."); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42,

48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to

replead.").  "Although leave to replead is within the discretion of the district court, refusal to

grant it without any justifying reason is an abuse of discretion." *Id.*

However, as stated above, Mr. Collier has had three chances to plead viable securities fraud claims, and his counsel conceded at oral argument that the Second Amended Class Action Complaint [doc. #52] was Mr. Collier's last, best effort to do so – an effort that this Court has concluded falls well short of the mark. Because Mr. Collier has been given multiple opportunities to amend his complaint and repleading would be unproductive or futile – and because he does not even seek an opportunity to replead – allowing him yet another chance to amend his complaint is not required. *See, e.g.*, *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 72 (2d Cir. 1996) ("[W]e have . . . upheld decisions to dismiss a complaint without leave to replead when a party has been given ample prior opportunity to allege a claim."); *Acito*, 47 F.3d at 55 ("One good reason to deny leave to amend is when such leave would be futile."); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend."), *quoted in Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *Mooney v. Vitolo*, 435 F.2d 838, 839 (2d Cir. 1970) ("Plaintiffs here were twice given an opportunity to replead. Therefore, it was within the sound discretion of the District Court to deny leave to replead on the third attempt."). Given the circumstances of this case, it is far more appropriate at this point for Mr. Collier to take his arguments to the Second Circuit, which, the Court notes, already has pending before it other cases that will likely require that court to explore further the loss causation requirement of securities fraud class actions. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, No. MDL 1554SAS, 2005 WL 743550 (S.D.N.Y. Apr. 1, 2005) (notice of appeal filed on June 10, 2005).

34

**The Clerk is directed to enter judgment of dismissal for Defendants and to close this file.**

IT IS SO ORDERED.

/s/      Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: <u>August 12, 2005</u>.**

**Appendix**



Aksys Common Stock Closing Price (12/20/01 through 12/31/04)